ELLIS PARK STONE COMPANY et al., Appellees, v. IOWA RAILWAY & LIGHT COMPANY et al., Appellees.

IOWA RAILWAY & LIGHT COMPANY, Appellant, v. CITY OF CEDAR RAPIDS, Appellee.

CONTRACTS: Construction—Indemnity for Operation of Dam. A contract which provides that one joint owner of a dam to whom it is turned over for joint mutual use shall hold the other joint owner harmless from any damages arising from the "operation" thereof, imposes upon the operator of the dam, as between said joint owners, liability for damages to overflowed property owners, consequent on the *general maintenance* of the dam above the authorized level, even though the other joint owner does reserve some control over the movable parts of said dam, in order to avoid such damages.

Headnote 1:  31 C. J. p. 429.

*Appeal from Linn District Court.*—F. O. ELLISON, Judge.

JANUARY 10, 1928.

Action to recover damages for injury to real property by backwater from a dam.   The nature of the action and the es-

sential facts are stated in the opinion. Judgment was entered against the Iowa Railway & Light Company, and the latter appeals.—*Affirmed.*

*John A. Reed, Oliver Longueville,* and *Don Barnes,* for appellant.

*Charles Penningroth, Owen Elliott,* and *George E. Farmer,* for City of Cedar Rapids, appellee.

*Carl Jordan,* for plaintiffs, appellees.

STEVENS, C. J.—The Iowa Railway & Light Company of Cedar Rapids owns and operates an electric light and power plant in the city of Cedar Rapids. For many years prior to 1913, a wooden dam had been maintained across the Cedar River at that place. Prior to the above date, the city had acquired a 59/64th interest in the dam and the dam site, which included all of the rights and appurtenances of every kind belonging therewith. On or about the above date, the Iowa Railway & Light Company had acquired the remaining 5/64th interest therein. The dam served the city in the maintenance of its water supply, but was inadequate for the purposes desired by it and appellant. Hence, on or about May 27, 1913, a written contract, which covers 17 pages of the abstract, was entered into between the appellee and appellant for the erection by the former of a new dam at the location of the old one, at a cost not exceeding $125,000. When completed, the dam would serve both the city and the Railway & Light Company. The statement of the contract as to the nature and character of the dam to be constructed is as brief and clear as it can well be made, hence we quote it:

"1. To employ Ira G. Hedrick of Kansas City, Missouri, to draft and prepare plans and specifications for a concrete and steel dam to be built across the Cedar River at or near the location of the present dam, together with a lock for transferring boats from the lower to the upper levels and the necessary concrete headraces, bulkheads and mechanical head gates for the delivery of such water as the said city may be entitled to, to the power plant and wheels hereinafter provided for and for an adequate tailrace for conducting the water from the power house

without undue loss of head; and for the delivery to the owners of
the remaining 5/64 of said dam and site in proper conduits or
raceways such water as each may be entitled to; said dam to be
of modern construction, of substantially the same height as the
present timber dam, to wit: 86.0 datum and to be equipped with
steel flashboards, wickets, or other suitable devices for bringing
the total head to ten feet in ordinary stages of the water. The
foundation of said dam shall be carried down into solid rock a
sufficient depth to insure against seepage and absolute safety
against scour, ice or floods. All movable portions of the dam to
be operated by machinery with power house on one side of the
Cedar River and the boat locks upon the other side thereof and
the entire construction of the same to cost not to exceed the sum
of $125,000. The plans so drafted shall be approved by the city
council of said city if satisfactory; if not, with such changes as
said council may require and shall then become a part of this
contract by this reference and the dam as referred to herein shall
be held to mean the said dam, machinery and other construction
which the city hereby obligates itself to install so provided for
in said plans and specifications as finally approved.

"2. To build, said dam, locks and all the raceways, bulk-
heads, head gates and other appurtenances thereunto belonging
at its own cost and expense according to the said plans and speci-
fications and to provide for supplying without undue loss of head
all that portion of the water belonging to said city under its
undivided interest in said dam and water rights to the party of
the second part, through the raceways under the terms and condi-
tions, and at, and for the prices, and for the term of years here-
inafter mentioned."

The services of the engineer named were secured by appel-
lant, plans and specifications were made, and were approved by
the city council, and the dam constructed, substantially at least,
in accordance therewith. It was finally completed, and accepted
by the city, and turned over to the appellant, in accordance with
the terms and provisions of the contract of April 10, 1916. In
the meantime, appellant had so constructed the new hydro-
electric light plant contemplated at the time the contract was
signed, as to make the power available to it for the operation of
its plant. The dam was equipped with steel gates or flashboards,
as required by the contract, which were provided with mechanical

devices for automatically raising and lowering the same by the action of the water, and also raising and lowering the same by hand.

In May, 1918, the Ellis Park Stone Company commenced an action against appellant for damages which it alleged were caused by the raising of the water in the river at the dam above the original elevation of 86 feet above city datum, which was the elevation for which appellee had a prescriptive right. Four other similar actions were commenced. Later, the city was made a party defendant in each of these actions. The city and the Railway & Light Company each filed answer and cross-petitions, alleging a cause of action against the other, and asking that, in the event that the plaintiffs, or any of them, should obtain a verdict in their favor, judgment therefor be entered against the other. A settlement as to the amount of damages suffered was, apparently, had of each of the five actions commenced against the parties, but no judgment was entered against either therefor. It was stipulated, however, upon the trial that, upon the final adjudication of the issues between appellant and appellee, judgment for the sums claimed, which aggregated something over $8,000, should be entered against the party found liable therefor. This stipulation eliminated all of the parties except the city and the Railway & Light Company, and the issues joined between them on their respective cross-petitions present the only question before this court for decision.

A jury was waived, and the cause tried to the court. It was stipulated by the parties that the damages complained of were caused by the maintenance of the crest of the water at an elevation above the city datum, and not by the permanent structure.

The following provisions of the contract are material, and constitute the principal subject of contention:

"Article 1. (Par. 5.) To grant to party of the second part the full control of all of the head gates to said raceways and all the machinery provided, for the movable portions of said dam, subject to the right upon the part of the city to so regulate the flow of water through said head gates as to prevent damage from overflow of lands which have not heretofore been subject to overflow by the maintenance of the dam at its present height or interference with the city's water supply

through its intake mains, but said intake mains shall at all times be located at points suitable therefor and as near the bottom of the river as is practicable.

"Article II. (Par. 5.) To assume and take over full control of the operation of all the movable portions of said dam during the life of this contract at its own cost and expense and to protect and hold the city harmless from any damages of any kind, nature, and description arising from the operation thereof."

It will thus be observed that each of the parties assumed or reserved certain control over definite portions of the dam. The contract obligated appellant to pay 10 per cent of the total net cost of the dam annually in equal semiannual payments for the use of its water power. It was evidently deemed necessary that the operation of the flashboards and of the dam generally should be confided to it. The reservation of the city set out above in Paragraph 5, Article 1, of the contract, of the right to so regulate the flow of water through the head gates as to prevent damage from overflow to lands not previously subject thereto, has nothing to do with the flashboards, or the crest of the water at the dam. The head gates and their use are explained by William G. Fargo, a civil engineer called by appellant, as follows:

"Q. Now, Mr. Fargo, what are the head gates,—what does that term cover?   A. Head gates may mean the gates at the entrance to the headrace,—the Taintor gates,—or they may be the gates near the power house or plant itself, as they were in this case. The purpose of these gates is to hold the water off the wheels. I desire to modify my answer. There are two places for head gates, and one of the two places for head gates is near the entrance to the canal. The head gates in the dam proper were down by the hydraulic electric plant.

"Q. Are there head gates in the dam itself?   A. Not ordinarily spoken of as head gates in the dam, unless they lead to some use of the water.

"Q. I take it the hydroelectric plant and the dam is an equipment taken together, in this particular instance they were part of the gates in the dam proper?   A. Yes, one set of the gates were in the dam. They were operated by manual operation. I mean by that, hand power applied by winches and pul-

leys. The purpose of the gate in the dam was to admit water to the power house. That was partly the purpose of these gates,—to regulate the amount of the water admitted to the hydroelectric plant. There was an automatic operation finally installed, and I believe these gates were operated in this way. The gates in the dam proper would surely control the amount of water permitted to go through the raceway down to the hydroelectric plant.''

The reason for the reservation in favor of the city was to enable it to control the head gates and the right to operate the same in such a way as to, when necessary, maintain the full discharge capacity of the dam. Appellee reserved no control over the flashboards, but, on the contrary, appellant assumed full control of the operation thereof and agreed in specific terms to protect and hold the city harmless from all damages of every kind, nature, and description that might result from the operation thereof.

It is clear that the quoted portions of the contract refer to wholly distinct matters. The city had a prescriptive right to maintain a water level in the river at an elevation of 86 feet above city datum only. It is not easy, when full scope and effect are given to the various stipulations of the parties and the findings of the court on questions of fact, to determine exactly what remains of the controversy. Some contention is made by appellant that the mechanism provided for the automatic operation of the flashboards was defective, that the counterweights were too heavy, and that the gates were not operated by the action of the water in the manner intended. Evidence was introduced, tending to show that, when appellant accepted the dam, on April 12, 1916, the gates were down, and that they were raised by appellant, perhaps by means of the mechanism provided for raising them by manual power. All that was involved or is suggested by any controversy on this point was necessarily determined by the court as questions of fact. That the gates were down in April, 1917, is disclosed by a decree entered in Wenig against appellant and the city of Cedar Rapids, which enjoins them from maintaining the elevation of the flashboards above 86 feet. This decree, on application of appellant, was modified on September 27, 1917. The decree, as modified, permitted appellant to raise the flashboards, upon con-

dition that it executed a bond in the penal sum of $10,000 to indemnify Wenig against any damages he might suffer on account thereof. The petition in this action was filed May 23, 1918. It seems to us, therefore, that this appeal presents only a question of the construction of the contract between the parties.

We have quoted the material paragraphs thereof. The assumption of full control over the operation of all movable portions of the dam during the life of the contract and of the obligation to hold the city harmless from any damages of any kind, nature, or description arising from the operation thereof is very sweeping, and leaves little room for construction. The word "operation" cannot be limited to the mere physical raising and lowering of the gates. What the parties evidently contemplated was that appellant was to protect appellee against every form of liability to property owners resulting from the maintenance of the water crest in the river above the elevation of 86 feet. This, it seems to us, is the plain, obvious meaning of the contract. This being true, we find nothing in the record upon which a reversal can be predicated.

Many questions are discussed by counsel, but, when analyzed, they present only questions of fact and of the interpretation of the contract. On the questions of fact, this court is precluded by the finding of the trial court. We think the contract should be construed as indicated. For the reasons stated, the judgment of the court below is—*Affirmed*.

EVANS, FAVILLE, KINDIG, and WAGNER, JJ., concur.